IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | &#124; | 11 Cr. 709 (JGK) |
| | &#124; | |
| | &#124; | |
| v. | &#124; | The Hon. John G. Koeltl |
| | &#124; | |
| GLENN COOPER, | &#124; | |
| | &#124; | |
| Defendant. | &#124; | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The defense respectfully submits this sentencing memorandum to request that the Court impose a reasonable sentence as per the plea agreement of the defense and the government.  Considering the factors outlined in 18 U.S.C. § 3553, it is respectfully requested that the Court impose a non-incarceratory sentence.

**Background**

Glenn Cooper is a 52-year-old man who has endured 30 years of dependency on crack cocaine.  Beginning with marijuana use at age 15, Mr. Cooper has used drugs his whole adult life.  Mr. Cooper has a slew of prior arrests and convictions, the vast majority of which relate to possession of personal use amounts of crack cocaine.

Since being arrested in this case in October 2011, Mr. Cooper has made tremendous strides to turn his life around.  U.S. Pretrial Service Officer Dennis Khilkevich has supervised Mr. Cooper for almost one year.  According to USPSO Khilkevich, Mr. Cooper has made an "excellent" adjustment to supervision.  Mr. Cooper has worked full-time at the same job since 2010, maintained a drug-free lifestyle, supported his long-time girlfriend, and regularly participated and volunteered at his Church.  Instead of giving up on himself when he was arrested, Mr. Cooper has done

1

everything possible to grab what may be his last opportunity to turn his life around and make a positive impact within the community.

## Procedural History

On October 31, 2011 Mr. Cooper voluntarily surrendered himself on an arrest warrant stemming from a drug conspiracy indictment filed in the Southern District on August 17, 2011.  The indictment charged Mr. Cooper with two crimes.  Count One charged Mr. Cooper and four co-defendants with conspiracy to distribute and possess with intent to distribute 28 grams and more of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(B).  Count Five charged Mr. Cooper and co-defendant James Butler with distributing and possessing with intent to distribute a quantity of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(C).  On June 5, 2012 Mr. Cooper pleaded guilty to a reduced charge under Count One[1] as described in a plea agreement provided to the Court and now stands before the Court for sentencing.

## The Plea Agreement

After being charged by federal authorities, Mr. Cooper, through counsel, expeditiously notified the government that he did not wish to seek a trial but instead wanted to accept responsibility and enter a plea of guilty.  A formal plea agreement between Mr. Cooper and the government was negotiated and a copy has been provided to the Court and the Probation Office.

Mr. Cooper agrees with the calculation of the appropriate Guidelines range as set forth in the plea agreement and in the Presentence Investigation Report ("PSR").  As detailed in those documents, the applicable Guidelines offense level is 10 and the

---

[1] Count One was reduced to the lesser offense delineated in 21 U.S.C. § 841(b)(1)(C).

applicable criminal history level is IV, resulting in a sentencing Guidelines range of 15 -

21 months.   While Mr. Cooper agrees that any sentence within that Guidelines range

would be reasonable under 18 U.S.C. § 3553 and United States v. Booker,[2] and its

progeny, Mr. Cooper urges the Court to consider a non-incarceratory sentence.

**The Probation Office's Sentencing Recommendation**

As of the filing of this memorandum, the Probation Office has not yet completed

the final draft of the PSR, which should include the Probation Office's sentencing

recommendation.

**Analysis**

**I.       Sentencing Post-*Booker***

Under Booker and its progeny, including United States v. Crosby,[3] and United

States v. Cavera,[4] the Sentencing Guidelines, while no longer mandatory, are advisory

and should be "taken into account" in determining the appropriate sentence under 18

U.S.C. § 3553(a).[5]

The Second Circuit has emphasized that "a district court may not presume that a

Guidelines sentence is reasonable; it must instead conduct its own independent review of

the sentencing factors, aided by the arguments of the prosecution and defense."[6]  When

considering whether to impose a sentence outside of the recommended Guidelines range,

a district court "'must consider the extent of the deviation and ensure that the justification

---

[2] 543 U.S. 220 (2005).
[3] 397 F.3d 103 (2d Cir. 2005).
[4] 550 F.3d 180, 187 (2d Cir. 2008)(en banc).
[5] Booker, 543 U.S. at 264; see also Cavera, 550 F.3d at 189 ("The Guidelines provide the 'starting point and the initial benchmark' for sentencing, and district courts must 'remain cognizant of them throughout the sentencing process'")(quoting Gall v. United States, 128 S. Ct. 586, 596 & n.6 (2007)).
[6] Cavera, 550 F.3d at 189.

is sufficiently compelling to support the degree of the variance,'"[7] in order to reach "an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing."[8]

In determining an appropriate sentence, a district court must adhere to § 3553(a), which directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Such a sentence must be fashioned:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[9]

In the final analysis, the district court must consider all the factors outlined 18 § 3553(a):

> • the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> • the four legitimate purposes of sentencing;
>
> • the kinds of sentences available;
>
> • the Guidelines range itself;
>
> • any relevant policy statement by the Sentencing Commission;

---

[7] Cavera, 550 F.3d at 189 (quoting Gall, 128 S. Ct. at 597).
[8] Id. (quoting 18 U.S.C. § 3553(a)).
[9] See 18 U.S.C. §3553(a)(2).

          • the need to avoid unwarranted sentence disparities among
                 defendants; and

          • the need to provide restitution to any victims.

## II.     Applying the § 3553(a) Factors

Under the negotiated plea agreement, the defense agrees that a reasonable sentence is a Guidelines sentence in the range of 15-21 months (the "Stipulated Guidelines Range").  Notwithstanding the parties' Stipulated Guidelines Range, Mr. Cooper urges the Court to consider imposing a sentence below the Stipulated Guidelines Range.[10]  Taking into account all of the factors set forth in § 3553(a), it is respectfully submitted that a non-incarceratory sentence would constitute not only a sentence "sufficient but not greater than necessary" to achieve the objectives of sentencing, but also a "reasonable" sentence under post-Booker sentencing jurisprudence.

### A.     The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Cooper

#### i.     *The Nature and Circumstances of the Offense*

The charged offense involved a conspiracy to sell crack cocaine in the Bronx. While various co-defendants of Mr. Cooper made numerous street-level sales of crack to undercover officers,[11] Mr. Cooper participated in one sale with co-defendant James

---

[10] The parties' plea agreement states that "the parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range, suggest that the Probation Department consider a sentence outside of the Stipulated Guidelines Range, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)."  Plea Agreement at 4.
[11] PSR ¶ 15-19.

Butler.[12]  During that single sale, Mr. Butler and Mr. Cooper sold six bags of crack to an undercover officer for $60.[13]  Mr. Cooper's sale involved less than 1.4 grams of crack.[14]

Mr. Cooper did not attempt to obstruct justice in any way, either at the time of his arrest or afterward.[15]

### ii.    The History and Characteristics of Mr. Cooper[16]

Mr. Cooper, 52, was born in Yonkers and raised in Port Chester, New York.[17] Mr. Cooper's parents, Jeanette Jones and Joseph Cooper, did not live together and Mr. Cooper was their only shared child.[18]  Mr. Cooper grew up in his mother's home along with his three maternal siblings: Lester Jones, Sonjay Jones, and Rhonda Jones.  Mr. Cooper was the oldest child in the household.[19]

During Mr. Cooper's childhood, his father lived in Mount Vernon.[20]  Mr. Cooper saw his father on a regular basis and has fond memories of his father taking him for rides in the commercial truck that his father drove for a living.[21]

When Mr. Cooper was about ten years old, his mother, who was a homemaker, began a relationship with Joe Harris, a roofer who lived "on and off" in the family household throughout Mr. Cooper's childhood.[22]  Mr. Cooper had a positive relationship

---

[12] PSR ¶ 18.

[13] PSR ¶ 18.

[14] PSR ¶ 20.

[15] PSR ¶ 25.

[16] The PSR details Mr. Cooper's family ties, family responsibilities, community ties, mental and emotional health, physical condition, substance abuse history, education and vocational skills, employment record, and financial condition.

[17] PSR ¶¶ 66-69.

[18] PSR ¶¶ 66-69.

[19] PSR ¶¶ 66-69.

[20] PSR ¶ 69.

[21] See, e.g., PSR ¶ 69 (Mr. Cooper mentioned this during his presentence interview).

[22] PSR ¶ 69.

6

with Mr. Harris and came to view Mr. Harris as a father-figure.[23]

Mr. Cooper's family struggled economically.  There were times when the family could not afford food to eat.[24]  Mr. Cooper describes the economic situation as "poor" and his childhood as "fair."[25]

Although Mr. Cooper does not recall any incidents of physical abuse as a child, he did suffer at least one traumatic event.[26]  At age 17, Mr. Cooper almost drowned while swimming.[27]  Fortunately, a friend saved his life.[28]  During the presentence interview, Mr. Cooper was visibly shaken when recounting his near death experience.

Mr. Cooper attended public schools in Port Chester.[29]  He left Port Chester High School around age 16 to go work; a high school transcript confirms that Mr. Cooper stopped going to school in 1977.[30]

Mr. Cooper's work history has revolved around being a laborer in various capacities that paid around minimum wage.[31]  From 2004 to 2011, Mr. Cooper was employed at Active Staffing Services, which placed Mr. Cooper in different laborer positions.[32]  Through Active Staffing Services, Mr. Cooper secured a job as a maintenance worker at Carlisle, a ladies clothes manufacturer.[33]  Since 2010, Mr. Cooper

---

[23] PSR ¶ 69.
[24] PSR ¶ 70.
[25] PSR ¶ 70.
[26] PSR ¶ 70.
[27] PSR ¶ 70.
[28] PSR ¶ 70.
[29] PSR ¶ 84.
[30] PSR ¶ 84.
[31] PSR ¶¶ 85-87.
[32] See PSR ¶¶ 87-88.
[33] See PSR ¶ 87-88.

has worked full-time at Carlisle.[34]  As a condition of his pretrial home detention in this case, the Court permitted Mr. Cooper to continue working.  As a result, Mr. Cooper has been able to support himself and provide financial support to his long-time girlfriend, Colleen Emanuel, with whom he shares a modest one bedroom apartment in the Bronx.[35]

One of the defining characteristics of Mr. Cooper is his almost life-long dependency on drugs, particularly crack cocaine.  Mr. Cooper first began smoking marijuana at age 15; he smoked marijuana daily until he was 18 or 19.[36]  Mr. Cooper began using cocaine at 21; he used cocaine once a week for a year.[37]

At age 22, Mr. Cooper starting using crack cocaine.[38]  Except for the times that he has been incarcerated or on probation, Mr. Cooper has used crack cocaine every day since age 22.[39]

Mr. Cooper's use of and dependency on crack cocaine has caused him unending pain and misfortune; his addiction also is a root cause for his participation in this crime, as well as the other crimes for which he has been arrested over the years.  Since 1989, Mr. Cooper has been arrested seventeen times.[40]  Of those seventeen arrests, ten arrests were for the crime of criminal possession of a controlled substance in the seventh degree, which is a crime charged for possessing a personal use amount of an illegal drug.[41]  As noted in the PSR, most of these crimes involved "possessing a glass pipe containing

---

[34] PSR ¶ 88.
[35] See, e.g. PSR ¶ 89.
[36] PSR ¶ 78.
[37] PSR ¶ 79.
[38] PSR ¶ 80.
[39] PSR ¶ 80.
[40] PSR ¶¶ 38-64.
[41] PSR ¶¶ 40, 46-49, 52-64.

crack/cocaine residue."[42]  Three other arrests were for criminal trespass or "intent to obtain transportation without paying;" that is, riding a subway without paying.[43]

For years, Mr. Cooper's drug dependency has led Mr. Cooper in and out of jail on minor offenses.  These arrests also have disrupted Mr. Cooper's ability to find and retain stable employment, creating a cycle of despondency, drugs, and delinquency.

Mr. Cooper has tried to end his drug dependency.[44]  In 1999 and 2001, Mr. Cooper was in inpatient drug treatment at Phoenix House, completing the program in 2002.[45]  Mr. Cooper also completed treatment with the SJRH/Archway Day Rehab Program in October 2003.[46]

Since being arrested in this case, Mr. Cooper has gone all out to turn his life around.  As of late October 2011, Mr. Cooper has refrained from taking any illegal drugs.  All fifteen of Mr. Cooper's urine screens have been negative for illicit drugs.[47]  Mr. Cooper even has stopped drinking alcohol.[48]

While on pretrial supervision in this case, Mr. Cooper has maintained steady employment at Carlisle and has been fully compliant with all the terms of his electronic monitoring.[49]  USPSO Khilkevich reports that Mr. Cooper is not only in full compliance with all reporting and bail conditions, but also that Mr. Cooper has made an "excellent" adjustment to supervision.[50]

---

[42] See PSR ¶¶ 46-49, 52-57, 61-64.
[43] PSR ¶¶ 44, 45, 50-51.
[44] PSR ¶ 82.
[45] PSR ¶ 82.
[46] PSR ¶ 82.
[47] PSR ¶ 14.
[48] PSR ¶ 81.
[49] PSR ¶ 14.
[50] PSR ¶ 14.

Mr. Cooper's "excellent" adjustment also is reflected in the acts of kindness he

has exhibited within his church and community.  Jerome Myers, a deacon at Mr.

Cooper's church, writes the following on Mr. Cooper's behalf:

> I am honored to know Mr. Glenn Cooper.  He has attended Church
> services regularly.  He is always willing to assist with any work
> needed on the Church properties. . . .  I have watched him take
> added responsibilities in the Services and he is very helpful with
> the children of the Church making sure their space is safe, clean
> and in order.  Mr. Cooper is an asset to the church and its
> surrounding community.[51]

Rachael Harper, the Council Vice President and Food Pantry Director at Mr.

Cooper's church, confirms Mr. Cooper's commitment to community and charity:

> [Mr. Cooper] has always displayed respect and consideration for
> others.  Over the last couple of months Mr. Cooper has been
> assisting in the food pantry.  His assistance has been vital to this
> program because we don't have many male volunteers.
>
> Whenever we have [a] huge truck delivery I thank God for Mr.
> Cooper's desire to be of service, He gets the truck unloaded and
> inspires others to help. . . .  On the Saturdays when Mr. Cooper
> comes . . . [h]e helps the elderly load their shopping carts; assist
> with packing bags of pantry for those people who are shut-ins.[52]

Evelyn Santiago, an Assistant Principal and member of Mr. Cooper's church,

states the following:

> I have had the pleasure of knowing Mr. Glenn Cooper for 7 years.
> Mr. Cooper has been very supportive of the community in which I
> reside. . . .  I have also worked with Mr. Cooper in the Community
> Center at St. Peter's.  He is very giving of his time and skills.  He
> has done great work in the church making sure things are repaired
> and cleaned.[53]

Mr. Cooper's good works are further corroborated by Catherine Emanuel, the

---

[51] Exhibit A, Letter of Deacon Jerome Myers.
[52] Exhibit B, Letter of Rachael Harper.
[53] Exhibit C, Letter of Evelyn Santiago.

Council President of Mr. Cooper's church, who notes Mr. Cooper's work with the church's Building and Grounds committee as well as the support Mr. Cooper has from the pastor, church council, and the congregation.[54]  In recognition of his good works, on June 17, 2012 the church awarded Mr. Cooper a "Certificate of Appreciation for Outstanding Commitment to St. Peter's Lutheran Church in the Bronx."[55]

Mr. Cooper is indigent.  He has no savings or assets.[56]  Mr. Cooper earns $9.50 an hour at Carlisle.  With his income, Mr. Cooper helps to pay for the household expenses that he and his girlfriend Colleen Emanuel share.[57]  Ms. Emanuel, a health aid, earns less than Mr. Cooper, making his monthly financial contribution vital to paying the rent and bills.

Mr. Cooper reports that he is in "fair" physical health.[58]  Mr. Cooper has persistent soreness in his left shoulder,[59] a condition that does not get much relief as a maintenance worker.  This case has caused a great deal of anxiety for Mr. Cooper, who takes Advil for headaches that he believes are stress-related.[60]  Mr. Cooper also reports that he has intermittent ringing in his ears, which he also believes is stress-related.  Mr. Cooper has difficulty with his memory, which was observed during the presentence interview.[61]

**B.     A Sentence Below the Guidelines Range Will Adequately and Reasonably Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

---

[54] Exhibits D & E, Letters of Catherine Emanuel.

[55] Exhibit F.  Also attached is Exhibit G, a letter of support from Christopher Cubitt.

[56] PSR ¶¶ 88-89.

[57] See PSR ¶ 89.

[58] PSR ¶ 76.

[59] PSR ¶ 76.

[60] PSR ¶ 76.

[61] PSR ¶ 77.

A sentence below the Stipulated Guidelines Range will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Combined with his lower level of criminal responsibility when compared to that of the co-defendants, Mr. Cooper's struggles with drug dependency and his concrete efforts to turn his life around warrant a sentence below the Stipulated Guidelines Range.

Such a sentence would send a strong message that participation in a drug conspiracy is a serious offense, yet provides some leniency for the unique circumstances of Mr. Cooper, thus providing a just punishment tailored for the offense and defendant.

C.      **A Sentence Below the Guidelines Range Will Afford Adequate Deterrence to Criminal Conduct and Will Adequately and Reasonably Protect the Public from Further Crimes of Mr. Cooper**

A sentence below the Stipulated Guidelines Range will provide more than adequate specific and general deterrence considering the facts before the Court. Mr. Cooper's exemplary behavior during the last year while on pretrial release demonstrates that Mr. Cooper has been deterred from committing further criminal acts.

D.      **The Court Should Decline to Impose a Fine**

Taking into consideration Mr. Cooper's indigency,[62] it is respectfully requested that the Court decline to impose a fine.

E.      **Restitution Should be Joint and Several**

If the Court finds that restitution is warranted, such restitution should be apportioned jointly and severally.

---

[62] PSR ¶¶ 88-89.

12

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that the Court impose a reasonable non-incarceratory sentence.

Dated:  October 22, 2012

Respectfully submitted,

_____/S/_____

SEAN M. MAHER
SM 7568
*Counsel for the Defendant*
The Law Offices of Sean M. Maher, PLLC
233 Broadway, Suite 801
New York, NY 10279
(212) 661-5333
(212) 227-5808 fax